*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JAMAAL JOSHUA VINCENT,

        Defendant-Appellant.

UNPUBLISHED
March 7, 2024

No. 360232
Kalamazoo Circuit Court
LC No. 2019-001597-FC

Before: HOOD, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Defendant Jamaal Joshua Vincent appeals as of right his convictions, following a jury trial, of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(f). The trial court sentenced Vincent as a fourth-offense habitual offender, MCL 769.12, to prison terms of 25 to 50 years and 20 to 40 years, to be served concurrently. We affirm.

## I. BACKGROUND

This case arises out of Vincent's pattern of sexual assault, which was discovered through testing of rape kits, and culminated in Vincent's conviction for sexual assaulting AD on October 4, 2009, while she was sleeping at his apartment. Prior to the assault, AD had been out celebrating her birthday with a friend she knew from work. Her friend had a prior relationship with Vincent. AD and her friend stopped at Vincent's apartment late at night and he offered to let them spend the night because it was late and they were tired. Vincent offered the women his bed while he slept in the living room. AD testified that she woke up during the night when she felt someone reaching around her side and touching her vaginal area. When she pushed the hand away, she realized it was a man's hand. Vincent then got onto the bed, held her hands down with his hands, and forced his penis into her vagina. Her friend, who was sleeping, did not hear or see anything. Later, AD and her friend dressed, left, and called the police. After filing a police report, AD had a sexual assault examination. The police also collected sheets from the bed where the incident occurred.

A few days later, AD and her friend met Vincent in a parking lot where Vincent gave AD $100 and balloons as a "birthday gift," and told her that he was sorry about what he had done and

it was a mistake. He pleaded with her not to pursue criminal charges. AD accepted the "gift" and informed the police she did not wish to pursue criminal charges. She did not see Vincent again until Vincent was charged.

The investigation of this matter was delayed because AD's sexual assault kit went untested for several years. In 2016, the investigation resumed, after the Michigan State Police began assisting with untested rape kits, including AD's rape kit. MSP analyzed the rape kit and concluded that DNA was found that matched Vincent's DNA profile. The prosecution charged Vincent with one count of penile-vaginal penetration and one count of digital penetration, both accomplished by force or coercion and causing personal injury.

The prosecution's theory at trial was that Vincent preyed on vulnerable, unsuspecting females while they slept. To that end, the prosecution offered evidence of two other sexual assaults committed by Vincent under similar circumstances against EW in December 2010 and against RF in October 2009. In each incident, the female victim was sleeping in a home where Vincent was present and Vincent had been involved in a consensual relationship with a woman who knew each victim and who was present in the home at the time of the assault. Prior to trial, the prosecution filed a motion in limine to introduce other-acts evidence under MCL 768.27b related to other sexual assaults Vincent committed, which the trial court granted.

At trial, EW described an assault similar to AD's. EW was a student and dancer. She met Vincent and his cousin while working as a dancer. In December 2010, EW, her cousin, Vincent, and a friend of his went out for dinner then returned to Vincent's apartment to play cards. Vincent allowed EW and her cousin to stay the night and sleep in his room. After falling asleep, EW woke with Vincent on top of her licking her vagina. She screamed and ran out of the apartment. As with AD, Vincent later apologized and offered to pay her money. Related to EW, the prosecution also called the Sexual Assault Nurse Examiner (SANE) Program nurse who examined EW, provided aftercare, and collected the sample for EW's rape kit. A DNA expert testified that Vincent was a possible contributor to a sample collected from EW. A neighbor who heard EW screaming, stating she had been raped, also testified.

Different from AD and EW, who were young adults at the time of their assaults, RF testified that Vincent assaulted her when she was 12 or 13 years old. Vincent was in a dating relationship with RF's mother. He began living with them. One night after RF and her mother fell asleep, he came into her bedroom and rubbed his penis up and down her arm. After reporting the assault to a daycare worker and her mother, Vincent apologized to her. In 2013, when she saw Vincent again, he again apologized and gave her money. When RF was 19 in 2017, Vincent saw her at a bar, contacted her on social media, and invited her to his apartment. When RF went to his apartment Vincent had sex with her despite her repeated statements that she did not want to. She later engaged in consensual sex acts with Vincent, which she initially denied at the preliminary exam, but admitted to at trial.

In addition to expert testimony on DNA, the prosecution introduced expert testimony on sexual abuse and related behaviors. Before trial, the prosecution filed a motion to permit expert testimony to address counterintuitive behavior by both victims and perpetrators of sexual abuse to assist the jury in understanding the evidence. The trial court agreed to permit testimony that addressed "the general education about victims and perpetrators," but warned the prosecutor to be

careful about not allowing the witnesses to vouch for the victims (both AD and the other-acts witnesses), or offer an opinion whether the victims were sexually abused or whether Vincent was a sexual offender. The trial court entered an order defining the scope of the permitted testimony, which provided:

> 1) The Court ruled that expert witness testimony of a nature that provides general education to jurors about:
>
> a. Common myths and misconceptions about non-stranger sexual assault;
>
> b. Common but often non-intuitive behaviors and reactions of sexual assault victims during and after sexual assaults; and
>
> c. Common but often non-intuitive behaviors, strategies and motivations of non-stranger sexual assault offenders is admissible at trial.
>
> 2) The Court ruled that the People's expert witness:
>
> a. May not render an opinion about or otherwise vouch for the credibility of any of the victim's [sic] or the other acts witness [sic];
>
> b. May not render an opinion about whether any of the victim's [sic] or the other acts witness [sic] are sexually [sic] assault victims or that they were sexually assaulted by the Defendant;
>
> c. May not render an opinion as to whether the Defendant is a sex offender; and
>
> d. May not render an opinion as to whether the Defendant sexually assaulted any of the victim's [sic] or the other acts witness [sic].
>
> 3) Additionally, the Court will give the standard cautionary jury instruction regarding expert witness testimony.

At trial, the prosecution called Patricia Haist, who testified as an expert on sexual assault victims and their behavior in general, and Ron Grooters, who testified as an expert in sexual-offender assessment and treatment. The prosecution also called Phyllis VanOrder, a nurse who conducted a sexual assault nurse examination of AD on the day of the alleged assault, who was qualified as an expert in sexual assault forensic examinations.

The defense theory at trial was that AD had consensual sex with Vincent, but later regretted doing so because Vincent was involved in a relationship with AD's best friend, so AD fabricated the allegations against Vincent. Vincent also argued that AD's claim that he sexually assaulted her while her best friend was in the bed next to them was not credible.

In October 2021, the jury found Vincent guilty on both counts of CSC-I as charged. He moved for a new trial arguing that the trial court erred by allowing expert testimony on sexual

assaults and related behaviors and erred by admitted the other-acts evidence. In a written opinion, the trial court denied the motion. This appeal followed.

## II. EXPERT TESTIMONY

Vincent first argues that the trial court erred by allowing improper expert testimony that denied him a fair trial. He challenges only the testimony of three experts who offered testimony on sexual assault behaviors related to victims and perpetrators. He further argues that volunteered testimony by Investigator Richard Johnson was the equivalent of improper expert testimony, which also denied him a fair trial. We disagree.

A trial court's decision regarding the admissibility of testimony, including expert testimony, is reviewed for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008). Vincent also raised these issues in a motion for a new trial, which the trial court denied. A trial court's decision whether to grant or deny a motion for a new trial is also reviewed for an abuse of discretion. *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018). A court abuses its discretion when it chooses an outcome that falls outside the range of reasonable and principled outcomes. *Id*.

## A. VOUCHING

Regarding Haist, VanOrder, and Grooters, Vincent does not argue that these witnesses were not qualified under MRE 702 to testify as experts in their fields, but rather argues that their testimony was offered for the improper purpose of vouching for AD's testimony and credibility, and exceeded the scope of the trial court's pretrial order. We disagree.

Vincent primarily relies on our Supreme Court's decision in *People v Thorpe*, 504 Mich 230; 934 NW2d 693 (2019), where the Court addressed the permissible use of expert testimony in cases involving sexual abuse of children. There, the Court observed that expert testimony is admissible to explain behavior that might be incorrectly construed as inconsistent with an actual abuse victim, but held that expert witnesses may not testify that children overwhelmingly do not lie when reporting sexual abuse because that type of testimony improperly vouches for the credibility of the complainant. *Id*. at 235, 258. Similarly, examining physicians cannot testify that a complainant was sexually assaulted or has been diagnosed with sexual assault without physical evidence to corroborate the complainant's account of sexual assault because such testimony also improperly vouches for the complainant's credibility and interferes with the role of the jury. *Id*. at 235.

Vincent summarily asserts that the testimony of all three experts was used to improperly vouch for AD's credibility and bolster her testimony. He does not, however, identify any particular testimony by any of the witnesses that involved commentary on AD's credibility or an opinion whether AD was actually sexually assaulted. First, VanOrder was not subject to the trial court's pretrial order because she was a combined fact and opinion witness who conducted AD's SANE examination. Her expert testimony was limited to the field of SANE examinations. Again, Vincent does not identify any testimony by VanOrder that involved commentary on AD's credibility or an opinion about whether AD was sexually assaulted.

-4-

Regarding Haist, we can find no evidence in the record that indicates that she vouched for AD's credibility. Haist, a psychologist, was qualified as an expert on sexual assault dynamics and responses. This Court has recognized the value of such testimony. See *People v Muniz*, 343 Mich App 437, 443; 997 NW2d 325 (2022) ("Michigan courts regularly admit expert testimony concerning typical and relevant symptoms of abuse . . . ."); *People v Spaulding*, 332 Mich App 638, 659; 957 NW2d 843 (2020) ("It has also long been recognized that the behavior of victims of varying kinds of trauma often appears irrational and confusing to most people; and expert testimony is admissible and appropriate to explain that behavior with no need to engage in an analysis of scientific reliability."). She testified that the "freeze response," similar to an animal playing dead, is a common response to sexual assault. She admitted that she never met AD, and the record discloses that she did not otherwise comment on the credibility of AD's allegations of a sexual assault or offer an opinion whether AD was actually sexually assaulted.

As with Haist and VanOrder, Vincent fails to identify the portion of Grooters's testimony that could be construed as commentary on AD's credibility or an opinion whether AD was sexually assaulted. The prosecution offered Grooters as an expert in sex-offender assessment and treatment. At the time of trial, he had 30 years of experience assessing adolescents and adults with sexual behavioral problems, including work for the Michigan Department of Corrections and United States Probation and Pretrial Services. Grooters had not met AD or Vincent. His testimony was largely not about sexual assault victims or AD. Rather, his testimony sought to explain common behaviors of non-stranger sexual offenders. Though Grooters described common traits of sex offenders that bore stark similarities to Vincent's conduct, this was not vouching. He did not comment on whether the jury should believe Vincent, or someone in Vincent's position, he merely described common behaviors. It was up to the jury to determine whether believe to AD and the other witnesses, and then up to the jury to determine if Vincent's conduct was similar to what Grooters described. This was not vouching.

Finally, Vincent fails to explain how either Haist's or Grooters's testimony exceeded the scope of the trial court's pretrial order allowing expert testimony. Their testimony appears to have fallen squarely within the trial court's order.

## B. RELEVANCE AND UNFAIR PREJUDICE

Vincent also argues that the testimony of Haist, Grooters, and VanOrder was irrelevant under MRE 401 and unfairly prejudicial under MRE 403.[1] Under MRE 401, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 402 provides that evidence that is not relevant is inadmissible. Under MRE 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *People v Sabin (After Remand)*, 463 Mich 43, 57-58; 614 NW2d 888 (2000). To determine if evidence should be excluded under MRE 403, a trial court should balance the following factors, among others:

---

[1] The Michigan Rules of Evidence were recently amended, effective January 1, 2024. We rely on the language of those rules as it existed at the time of the trial court's decision here.

> [T]he time required to present the evidence and the possibility of delay, whether the evidence is needlessly cumulative, how directly the evidence tends to prove the fact for which it is offered, how essential the fact sought to be proved is to the case, the potential for confusing or misleading the jury, and whether the fact can be proved in another manner without as many harmful collateral effects. [*People v Daniels*, 311 Mich App 257, 273; 874 NW2d 732 (2015) (citation omitted).]

Unfair prejudice exists where there is a danger that evidence will be given undue or preemptive weight, or where it would be inequitable to allow use of the evidence. *People v Mills*, 450 Mich 61, 75-76; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). Vincent's challenges to each witness's testimony on grounds of relevancy and unfair prejudice are separately discussed below.

### 1. HAIST

Vincent argues that Haist offered only a general narrative that did not involve any conduct related to AD. Although Haist did not refer specifically to any particular conduct by AD, we disagree that there was no connection between Haist's testimony and conduct at issue by AD.

AD testified that she did not do anything to resist Vincent's sexual assault because she was very scared and nervous, and she did not know what was going on. She also thought that Vincent might have a weapon. Haist explained that a "freeze response" during an assault is a common response by sexual assault victims, particularly if the victim feels that fighting or fleeing is not possible. Haist also explained that victims of sexual assault often will experience confusion over why the assault happened, or they will blame themselves or question their own judgment, especially if the assault was committed by someone they knew. Whether the victim knows the perpetrator can also impact whether the victim reports the crime or pursues criminal charges. Haist also discussed the progression of feelings a victim will experience over time. Haist also explained that victims may have difficulty recounting an assault in a logical sequence, which can make their interactions with law enforcement difficult.

This testimony provided another tool for assessing AD's credibility. AD testified that she was very confused after Vincent sexually assaulted her. According to AD's friend, AD initially went back and forth about whether to contact the police, before eventually deciding to do so. AD admitted remaining at home for a few days after the sexual assault because she felt sad and depressed. AD also admitted that she and her friend met with Vincent a few days later. According to AD's friend, the three of them had dinner together at a restaurant. A police detective testified that during the two-month period after AD reported the sexual assault, she equivocated about whether to pursue charges. Haist's testimony assisted the jury in understanding behaviors of sexual assault victims following an assault, and was probative of whether AD's reactions during the assault, her emotional state afterward, and her conduct in the days and weeks after the alleged assault was inconsistent with a sexual assault. Moreover, contrary to Vincent's complaint that Haist's testimony was too general, the fact that Haist did not directly comment on any particular conduct by AD minimized, rather than enhanced, any potential for unfair prejudice, because it reduced the risk that the jury would perceive that Haist was offering an opinion that certain behaviors by AD demonstrated that a sexual assault must have occurred.

### 2. VANORDER

Vincent also argues that VanOrder's testimony included too much irrelevant information and was offered solely to elicit sympathy for AD. Although Vincent asserts that it was not necessary to provide details about how a SANE examination is performed or provide descriptions of the room where the examination was conducted, he does not explain how such information was used to elicit sympathy for AD or could be considered prejudicial. Otherwise, Vincent merely cites 50 pages of VanOrder's testimony without referencing any specific testimony that he claims was objectionable. "[A]n appellant may not simply announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments[.]" *People v Bowling*, 299 Mich App 552, 559; 830 NW2d 800 (2013) (quotation marks and citation omitted). Vincent has not demonstrated that VanOrder's testimony was irrelevant or prejudicial.

### 3. GROOTERS

Vincent also generally argues that Grooters's testimony was prejudicial because it described the behavior and conduct of long-term sexual offenders and did not offer information relevant to this case, without identifying any particular testimony by Grooters that he contends was improper. Contrary to his argument, Grooters's testimony discussed several common characteristics and behaviors of sexual offenders that were identified by fact witnesses in this case, and which a jury might construe as being inconsistent with a motivation to sexually offend. Grooters explained that offenders are overwhelmingly more likely to sexually assault someone they know, rather than a stranger, and Grooters explained the motivations behind such assaults and strategies that an offender might commonly use to exploit known victims, such as beginning the sexual assault when the victim is sleeping. Testimony in this case indicated that AD and both other-acts witnesses were people who Vincent knew before the assault, and the assaults of these persons began when they were sleeping. Grooters explained that this will allow the offender to make up excuses if the victim wakes up, such as that the offender went to the wrong room or misidentified the victim. One of the other-acts witness, EW, testified that when she woke up during Vincent's assault and physically resisted, Vincent responded that he thought that EW was EW's cousin, with whom he was involved in a sexual relationship. Grooters also explained that offenders may develop a pattern of behavior if they continuously get away with sexual assaults, because it reinforces that they can continue to get away with the assaults by following the same pattern. The evidence in this case showed that the offense against AD and the offenses against the other-acts witnesses followed a pattern of assaulting victims while they were sleeping, and Vincent was able to continuously avoid prosecution. Grooters also explained that it is common for sexual offenders to use verbal or monetary apologies to make sure that the victim does not tell on them. Evidence was presented that after AD and EW accused Vincent of sexual assault, he became apologetic and offered them money. Furthermore, there was evidence that Vincent was involved in sexual relationships with an acquaintance of AD and with acquaintances of both other-acts witnesses. Grooters testified that offenders who have other intimate partners may still commit sexual offenses against others because it meets a different need for them.

In sum, the record discloses that Grooters offered testimony that was relevant to conduct at issue in this case, and which could have assisted the jury in understanding whether Vincent's conduct was consistent with an intent, purpose, and motivation to sexually offend. Further, Vincent does not contend, and the record does not indicate, that Grooters, who admittedly did not know and had not met Vincent, offered any opinion whether he was actually a sexual offender.

Thus, his testimony did not invade the province of the jury to determine Vincent's guilt or innocence. Accordingly, we reject Vincent's argument that Grooters's testimony was irrelevant or should have been excluded under MRE 403.

## C. UNQUALIFIED EXPERT TESTIMONY

Vincent argues that reversal is required because Investigator Johnson was allowed to give extensive testimony that was the equivalent of expert testimony, including "a tutorial in brain and memory science," despite that he was not qualified as an expert. We disagree that reversal is required.

As Vincent observes, Investigator Johnson, who was never qualified as an expert witness, initially provided narrative responses to questions that exceeded the scope of the questions asked and sometimes offered opinions regarding sexual assault victims in general, despite admonishments from the prosecutor and the court to limit his answers to the specific questions asked. Defense counsel however timely objected to those objectionable responses, and the trial court promptly struck the improper responses and instructed the jury to disregard the responses. In its final instructions, the court again instructed the jury not to consider any evidence that was excluded or ordered stricken. The jury is presumed to have followed the court's instructions and disregarded the responses that were stricken. *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020). Because the trial court timely and appropriately addressed Investigator Johnson's objectionable responses by sustaining Vincent's objections and striking the testimony, and the court's instructions to disregard the responses were sufficient to cure any error, Vincent was not denied a fair trial.

## III. OTHER-ACTS EVIDENCE

Next, Vincent argues that the trial court erred by permitting other-acts evidence under MCL 768.27b. Vincent does not specifically argue that the testimony of the other-acts witnesses, EW and RF, was inadmissible, but argues that it was improper to call additional, collateral witnesses regarding the other sexual assaults, because it resulted in a trial within a trial, causing unfair prejudice—essentially an argument that the evidence violated MRE 403. He also argues that the trial court abused its discretion by denying his motion for a new trial with respect to this issue. We disagree.

This Court reviews a trial court's decision to admit evidence for an abuse of discretion. *People v Washington*, 468 Mich 667, 670; 664 NW2d 203 (2003). Any preliminary questions of law are reviewed de novo. *Id*. at 670-671. A trial court's decision whether to grant or deny a motion for a new trial is also reviewed for an abuse of discretion. *Johnson*, 502 Mich at 564. An abuse of discretion occurs when the trial court chooses an outcome that falls outside the range of reasonable and principled outcomes. *Id*.

Before trial, the trial court granted the prosecution's motion to introduce under MCL 768.27b evidence of other sexual assaults committed by Vincent. At trial, the prosecution offered evidence of the two other sexual assaults involving EW and RF. In addition to presenting the testimony of EW and RF regarding the sexual assaults, the prosecution also called additional

witnesses who had information regarding the other incidents. Vincent argues that the presentation of these additional witnesses denied him a fair trial.

He cites multiple cases that generally address concerns associated with presenting collateral witnesses to support evidence of a defendant's other bad acts, which can cause juror confusion by creating a "trial within a trial" in violation of MRE 403. However, there is nothing in MCL 768.27b that limits who can offer testimony permitted by the statute, and the decisions cited by Vincent do not blanketly prohibit so-called collateral witnesses from offering testimony regarding a defendant's commission of other acts of sexual assault. Ultimately, the admissibility of such evidence is governed by MRE 403.

MCL 768.27b(1) provides:

> Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

In a case where the defendant is accused of sexual assault, MCL 768.27b(1) expressly permits "evidence of the defendant's commission of other acts of . . . sexual assault." The statute does not prescribe or limit the type of evidence that is admissible for this purpose, or the number of witnesses who can be called. Moreover, unlike MRE 404(b)(1), which prohibits use of evidence of a defendant's other crimes or bad acts for the purpose of proving action in conformity therewith, evidence offered under MCL 768.27b is admissible for any purpose for which it is relevant, including a defendant's propensity to commit a sexual offense, subject only to exclusion under MRE 403. *People v Rosa*, 322 Mich App 726, 733-735; 913 NW2d 392 (2018). In short, there is nothing in the language of MCL 768.27b(1) itself that expressly prohibits the use of so-called collateral witnesses offered to show a defendant's "commission of other acts of . . . sexual assault."

But other-acts evidence offered under MCL 768.27b(1) is still subject to exclusion under MRE 403, which provides that evidence, although relevant, may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." To reiterate, to determine if evidence should be excluded under MRE 403, a court should balance several factors, including

> the time required to present the evidence and the possibility of delay, whether the evidence is needlessly cumulative, how directly the evidence tends to prove the fact for which it is offered, how essential the fact sought to be proved is to the case, the potential for confusing or misleading the jury, and whether the fact can be proved in another manner without as many harmful collateral effects. [*Daniels*, 311 Mich App at 273.]

Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence. *Mills*, 450 Mich at 75-76.

Notably, Vincent does not dispute that EW's and RF's testimony was admissible under MCL 768.27b(1). He only challenges the admissibility of testimony from other witnesses who were offered to corroborate the testimony of EW and RF. We agree that under MRE 403 the trial court should consider the need and extent of additional witnesses to support other-acts testimony like that of EW and RF offered under MCL 768.27b(1), because of the potential for juror confusion, undue delay, a waste of time, or a trial within a trial. But considering all the relevant factors related to the acts involving RF and EW, we are not persuaded that the trial court abused its discretion by allowing the additional testimony.

At the threshold, we do not believe that the testimony of the additional witnesses was too confusing for the jurors to sort out, particularly where the witnesses testified on different days and at different times than AD's witnesses, so the jury would not have had difficulty keeping the witnesses separate. Further, although the additional witnesses extended the trial's duration, we do not believe that the additional time necessary to call these witnesses resulted in *undue* delay, considering the highly probative value of the evidence and its relationship to Vincent's conduct against AD. First, the testimony of the other-acts witnesses was highly probative of whether Vincent sexually assaulted AD considering (1) the extremely similar circumstances under which the assaults were committed, and (2) in the case of EW, common DNA evidence. Second, particularly with respect to EW, the additional witnesses were highly relevant to corroborate EW's account of being sexually assaulted by Vincent, particularly where there was evidence that her complaint of a sexual assault was not pursued by authorities for several years, which otherwise may have caused the jury to question the veracity of her accusation. The additional witnesses provided the jury with a more complete understanding of the circumstances surrounding EW's accusation, including a witness who observed EW immediately after the assault, a nurse who examined her on the day of the assault, the detective who investigated her complaint, and a forensic examiner who analyzed her rape kit. Further, only one additional witness was called related to RF. Here, where at least one aspect of the defense theory was a consensual sexual encounter, the probative value of this evidence is amplified, justifying additional evidence related to the other-acts.

Considering all of these factors, the trial court had a reasonable and principled basis for allowing the additional witnesses, and therefore, did not abuse its discretion by permitting their testimony. Accordingly, the trial court also did not err by denying Vincent's motion for a new trial with respect to this issue.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, Vincent argues that he is entitled to a new trial because he did not receive the effective assistance of counsel at trial, and the trial court erred by denying his motion for a new trial on this issue. We disagree.

Claims of ineffective assistance of counsel involve mixed questions of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews any factual findings by the trial court for clear error, and any constitutional determinations are reviewed de novo. *Id*. To the extent that Vincent raises additional ineffective-assistance claims that he did not raise in his motion for a new trial, our review of those claims is limited to errors apparent from the record. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

An effective assistance of counsel claim has two parts. *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022). To establish ineffective assistance of counsel, Vincent must first establish that counsel's performance was deficient, which involves consideration " 'whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *Id.*, quoting *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Second, the defendant must also demonstrate that he was prejudiced by counsel's error. To establish prejudice, Vincent " 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Leffew*, 508 Mich at 637, quoting *Strickland*, 466 US at 694. "Reasonable probability means 'a probability sufficient to undermine confidence in the outcome.' " *Leffew*, 508 Mich at 637, quoting *Strickland*, 466 US at 694. Vincent has the burden of establishing the factual predicate for his ineffective-assistance claim. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

Vincent has not established deficiency or prejudice. Vincent claims trial counsel failed to make objections, but presents very generalized ineffective-assistance claims. Broadly, he claims counsel failed to object to "character assassinations" of Vincent, collateral other bad acts, and statements from the prosecutor including commenting on the record and vouching for witness credibility.

He summarily asserts that trial counsel was ineffective for failing to object to "improper prosecutorial comments," but he does not specify what comments were improper. In his motion for a new trial, Vincent argued that the prosecutor improperly vouched for the other-acts witnesses in her closing argument. Although it is improper for a prosecutor to express personal knowledge or a personal belief regarding the credibility of a witness, or to vouch for the credibility of a witness by implying some special knowledge about the witness's truthfulness, a prosecutor may comment on a witness's credibility and argue from the evidence that a witness is credible. *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995); *People v Meissner*, 294 Mich App 438, 456; 812 NW2d 37 (2011); *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). A review of the remarks that Vincent challenged in his motion for a new trial reveals that the prosecutor referred to matters in evidence to argue that EW and RF were credible witnesses. The prosecutor did not suggest that she had special knowledge of any facts, unknown to the jury, that the witnesses were testifying truthfully. Because the challenged remarks were not improper, any objection would have been futile. Counsel is not ineffective for failing to make a futile objection. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Vincent also specifically argues that counsel was ineffective for failing to object to the testimony of Haist, VanOrder, Grooters, and Johnson, and for failing to object to corroborating witnesses for the other-acts evidence. As stated above, we find no error related to Haist, VanOrder, and Grooters or the presentation of the other-acts evidence, so Vincent cannot establish a deficiency related to counsel deciding not to raise a futile objection. *Ericksen*, 288 Mich App at 201. And as observed, trial counsel objected to the portions of Johnson's testimony that were objectionable. Vincent has not established deficiency, let alone prejudice.

Vincent contends that defense counsel was ineffective for failing to object to portions of AD's testimony, but he does not specify the grounds on which he believes counsel should have objected or explain why he believes the testimony was improper. Regarding AD's testimony

-11-

describing her personal difficulties and anxiety, feelings, and emotional state after the sexual assault, we note that Vincent was charged with CSC-I under the theory that he committed the sexual acts using force or coercion and causing personal injury, which can include mental anguish, which is the theory argued by the prosecutor. Much of the challenged testimony was relevant to the issue of mental anguish. Vincent also faults counsel for not objecting to AD's testimony describing her experience during the SANE examination. However, because evidence was introduced regarding AD's description of the assault during her medical examination, evidence of her demeanor and emotional state during the examination was relevant to the weight and veracity of her statements at that time. He also complains that counsel was ineffective for not objecting to testimony regarding AD's personal life and experiences before the sexual assault. The testimony primarily provided the jury with background information about AD, which was foundational and additionally probative on why she remained passive during the sexual assault by Vincent. Further, to the extent that the testimony revealed that AD had past personal difficulties, there was no suggestion that Vincent was responsible for these past difficulties. Regarding AD, Vincent has not demonstrated that it was objectively unreasonable for counsel not to object to any of this challenged testimony, or that he was prejudiced by counsel's failure to object.

In his motion for a new trial, Vincent argued that counsel was ineffective for not objecting to the trial court's failure to give special instructions related to the admission of the other-acts evidence. The record discloses that the trial court instructed the jury as follows:

> You have heard evidence that was introduced to show that the defendant has engaged in improper sexual conduct with—for which he is not on trial.

> If you believe this evidence, you must be very careful to consider it for only one limited purpose, that is to help you judge the believability of the testimony of [AD] regarding the acts for which the defendant is now on trial. You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the defendant is a bad person or that the defendant is likely to commit crimes. You must convict the defendant here because—or I'm sorry, you must not convict the defendant here because you think he is guilty of other bad conduct.

This instruction followed pattern instruction M Crim JI 20.28, which, according to the use note, is to be given where there is evidence of other uncharged sexual acts between the defendant and the complainant.

In his motion for a new trial, Vincent argued that counsel should have instead requested either M Crim JI 20.28a or M Crim JI 4.11. Trial counsel was not deficient for not requesting M Crim JI 4.11 because it does not apply, and Vincent has not demonstrated that he was prejudiced by the use of M Crim JI 20.28 instead of M Crim JI 20.28a. First, there is no deficiency related to M Crim JI 4.11 because that instruction addresses evidence of a defendant's other crimes or improper acts admitted under MRE 404(b)(1). The court did not admit the other-acts evidence in this case under MRE 404(b)(1). Rather, the evidence was admitted under MCL 768.27b, which does not require a showing that the evidence was offered for one of the purposes set forth in M Crim JI 4.11. Because M Crim JI 4.11 was not applicable to the evidence of Vincent's sexual

assaults of other women, any request for that instruction would have been futile. *Ericksen*, 288 Mich App at 201.

M Crim JI 20.28a, however, likely was the proper instruction for this case. M Crim JI 20.28 and M Crim JI 20.28a are substantially similar. A trial court should give M Crim JI 20.28a in criminal sexual conduct cases where there is evidence of a defendant's other acts of sexual misconduct introduced under MCL 768.27a. This instruction applies where there is evidence of uncharged sexual misconduct against other persons, as in this case. By contrast, M Crim JI 20.28 applies where there is evidence of uncharged sexual misconduct involving the complaint. Although it appears that M Crim JI 20.28a was the more appropriate instruction, Vincent has not demonstrated that he was prejudiced by the court's decision to instead give M Crim JI 20.28.

The instruction given by the trial court advised the jury that evidence had been introduced that Vincent had engaged in improper sexual conduct for which he was not on trial, and that if the jury believed that evidence, it could be considered only for the purpose of determining whether he committed the acts for which he was on trial. The court's instruction also advised the jury that it could not consider the other-acts evidence to determine that Vincent is a bad person or is likely to commit crimes, and it could not convict him because he may be guilty of other bad conduct. The trial court's instruction was consistent with the purpose for which evidence may be introduced and considered under MCL 768.27b, and it protected Vincent's rights by informing the jury that it could not convict him because he may be a bad person or was guilty of other bad conduct for which he was not on trial. Thus, there is no reasonable probability that the outcome of Vincent's trial would have been different if the court had given M Crim JI 20.28a instead of M Crim JI 20.28.

Finally, although Vincent alternatively requests an evidentiary hearing, he does not indicate what issues require development of a factual record or what evidence he intends to offer at an evidentiary hearing to support his claims. Therefore, we reject his request for an evidentiary hearing. See *People v McMillan*, 213 Mich App 134, 141-142; 539 NW2d 553 (1995); *People v Simmons*, 140 Mich App 681, 685; 364 NW2d 783 (1985).[2]

We affirm.

/s/ Noah P. Hood
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado

---

[2] Although opinions issued before November 1, 1990, are not strictly binding pursuant to MCR 7.215(J)(1), as a published opinion, *Simmons* nevertheless "has precedential effect under the rule of stare decisis" pursuant to MCR 7.215(C)(2). See *People v Darga*, ___ Mich App ___, ___ n 6; ___ NW2d ___ (2023) (Docket No. 363178); slip op at 8-9 n 6.